IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn

Civil Case No. 01-cv-01644-REB-CBS

CARTEL ASSET MANAGEMENT, a Colorado corporation,

　　Plaintiff,

v.

OCWEN FINANCIAL CORPORATION, a Florida corporation;
OCWEN FEDERAL BANK FSB, a subsidiary of OCWEN FINANCIAL CORPORATION
and
OCWEN LOAN SERVICING, LLC,

　　Defendants.

## ORDER DENYING RULE 702 MOTIONS

**Blackburn, J.**

　　This matter is before me on the following motions: (1) the plaintiff's ***Daubert*** **Motion To Exclude "Expert Testimony" of Stephen H. Murray** [#654][1] filed August 5, 2010; (2) the plaintiff's the plaintiff's ***Daubert*** **Motion To Exclude "Expert Testimony" of Robert A. Bardwell** [#655] filed August 6, 2010; and (3) the plaintiff's ***Daubert*** **Motion To Exclude "Expert Testimony" of Roy Weinstein** [#657] filed August 6, 2010. The defendants filed responses [#701 (Sealed), #708 (public entry for #701), #704, #705]. The plaintiff filed replies [#713, #716, #719]. I deny the motions.

### I. JURISDICTION

　　I have jurisdiction over this case pursuant to 28 U.S.C. § 1332 (diversity of

---

　　[1] "[#654]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

citizenship).

## II.  FACTS

This case is set to commence trial on September 13, 2010.  The trial is a re-trial on the issue of damages, including punitive damages, for misappropriation of trade secrets.  The re-trial was ordered by the United States Court of Appeals for the Tenth Circuit.  ***Cartel Asset Management v. Ocwen Financial Corp., et al.***, Nos. 04-1502 & 04-1517, 249 Fed. Appx. 63 (10th Cir. 2007).

The jury in the first trial found that defendant Ocwen Federal Bank FSC (bank) misappropriated trade secrets of plaintiff Cartel Asset Management when the bank misappropriated from Cartel of a database of real estate brokers and agents who could provide broker price opinions (BPOs) concerning parcels of real estate.[2]  One issue in the re-trial is the damages that were caused by the bank's misappropriation of the database.  One of Cartel's damages theories is that the bank benefitted from its misappropriation of Cartel's database because the bank got a head start in developing its own service that provided BPOs to buyers in need of that service.  This theory raises the question of how long it would have taken the bank to develop its own database of BPO providers had the bank not misappropriated Cartel's database.

## III.  STANDARD OF REVIEW

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert witness testimony, provides:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or education, may

---

[2]  In this order, I will refer to the defendants collectively as Ocwen.

> testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

**FED.R.EVID.** 702. The standards outlined in Rule 702 implicate, of course, the standards for admission of opinion testimony stated in the so-called *Daubert* trilogy. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). The court's application of the standards of Rule 702 and the related cases is "a flexible and commonsense undertaking in which the trial judge is granted broad latitude in deciding both how to determine reliability as well as in the ultimate decision of whether the testimony is reliable." *Smith v. Ingersoll-Rand Co.*, 214 F.3d. 1235, 1243 (10th Cir. 2000) (internal quotation and citations omitted). The Supreme Court has described the court's role in weighing expert opinions against these standards as that of a "gatekeeper." *See Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

Under *Daubert* and its progeny, an expert opinion is reliable if it is based on scientific knowledge. "The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. In short, the touchstone of reliability is "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id*. at 592 - 593; *see also Truck Insurance Exchange v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004). The party proffering the expert opinion must demonstrate both that the expert has employed a method that is scientifically sound and that the opinion is "based on facts which enable [the expert] to

express a reasonably accurate conclusion as opposed to conjecture or speculation." ***Goebel v. Denver and Rio Grande Western Railroad Co.***, 346 F.3d 987, 991 (10th Cir. 2003) (quoting ***Gomex v. Martin Marietta Corp.***, 50 F.3d 1511, 1519 (10th Cir. 1995)).

Rule 702 demands also that the expert's opinion be relevant, that is, that the testimony "fit" the facts of the case. ***Daubert***, 509 U.S. at 591-592; ***In re Breast Implant Litigation***, 11 F.Supp.2d 1217, 1223 (D. Colo. 1998). "'[T]he standard for fit is higher than bare relevance.'" ***In re Breast Implant Litigation***, 11 F.Supp.2d at 1223 (quoting ***In re Paoli Railroad Yard PCB Litigation***, 35 F.3d 717, 745 (3rd Cir. 1994), ***cert. denied***, 115 S.Ct. 1253 (1995)). The proffered evidence must speak clearly and directly to an issue in dispute in the case. ***Id.***

Guided by these principles, the trial court has broad discretion in determining whether expert testimony is sufficiently reliable and relevant to be admissible. ***Truck Insurance Exchange***, 360 F.3d at 1210; ***Smith v. Ingersoll-Rand Co.***, 214 F.3d 1235, 1243 (10th Cir. 2000). The overarching purpose of the court's inquiry is "to make certain that the expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." ***Goebel***, 346 F.3d at 992 (quoting ***Kumho Tire Company***, 526 U.S. at 152). Rule 702 requires that opinion testimony be the product of reliable principles and methods, and that an opinion witness has applied those principles and methods reliably to the facts of the case. The reliability analysis applies to all aspects of an expert's testimony, including the facts underlying the opinion, the methodology, and the link between the facts and the conclusion drawn. ***Heller v. Shaw Indus.***, 167 F.3d 146, 155 (3d Cir.1999). Consequently, the court must make a practical, flexible analysis of the reliability of the testimony, considering relevant

4

factors and the circumstances of the case. *See, e.g., Kumho Tire*, 526 U.S. at 149-52; *Heller*, 167 F.3d at 155.

Generally, "rejection of expert testimony is the exception rather than the rule." *U.S. v. Nacchio*, 519 F.3d 1140, 1154 (10th Cir. 2008) (quoting Fed. R. Evid. 702 , 2000 Advisory Comm.'s Notes). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. 579 at 596.

## III. ANALYSIS

### A.

### *Daubert* Motion To Exclude "Expert Testimony" of Stephen H. Murray [#654]

The defendants offer the opinion testimony of Stephen H. Murray. In his report, Murray offers four opinions related to the question of how long it would have taken the bank to develop a database of BRO providers in 2000. Those opinions are (1) how brokers qualified to prepare BPOs could have been located in 2000; (2) whether real estate agents and brokers were willing and able to prepare BPOs in 2000; 3) any specialized training, experience or education that would have been required to provide such services; and (4) in 2000, how difficult was it to identify brokerage firms or sales agents who were willing to prepare a BPO in a given market. *Motion to exclude* [#654] filed August 5, 2010, Exhibit A (Murray Report), p. 1. Cartel argues that these opinions must be excluded because Murray is not qualified to offer these opinions, Murray does not have sufficient knowledge of Ocwen's database of BPO providers, defense counsel directed substantial alterations to Murray's report, and Murray's opinions generally do not satisfy the requirements of *Daubert*.

5

1. <u>Qualifications</u>.  Cartel argues that Murray is not qualified to offer his four opinions because he has no experience ordering or preparing BPOs, and he has not attempted to build a national database of BPO providers at any time.  Murray indicates in his report that he has provided consulting serviced to the residential real estate brokerage industry for 24 years and has published a newsletter and one or more directories.  Murray's publications include the REAL Trends 500 and Up-and-Comers list, "which comprised over 700 brokerage firms that were capable and willing to provide BPO services in 2000."  *Murray Report*, p. 3.  This experience is sufficient to qualify Murray to opine about the difficulty Ocwen would have had in constructing a database of BPO providers in 2000, about the number of brokerage firms from which BPOs could be ordered in 2000, and about the training and experience that generally was required of those who could provide BPOs at the relevant time.  Any weaknesses in Murray's qualifications implicate weight, not admissibility.

2. <u>Knowledge of Ocwen's database</u>.  In his deposition, Murray indicated that he does not know the detailed requirements used by Ocwen when determining which BPO providers to add to its database in 2000.  Murray does not propose to opine about Ocwen's specific requirements for BPO providers.  Rather, he proposes to opine about any specialized training and experience that generally was required of BPO providers and how difficult it was to identify BPO providers at the relevant time.  As Ocwen notes in its response, the testimony of Cartel's president indicates that Cartel could explain to the average real estate agent the requirements for a BPO, which was satisfactory to Cartel, in five to ten minutes.  *Response* [#704], p. 8.  In this case, Cartel claims Ocwen misappropriated Cartel's list of BPO providers that had been determined to be satisfactory to Cartel.  Ocwen's use of Cartel's list of BPO providers and Ocwen's

6

misappropriation of that list both tend to indicate that Cartel's standards for BPO providers were acceptable to Ocwen. In this context, and considering the specific opinion expressed by Murray, his lack of knowledge of Ocwen's specific requirements for BPO providers does not undermine the factual basis for Murray's opinion. At most, Murray's lack of knowledge of Ocwen's specific requirements goes to the weight to be accorded to his opinion and not to its admissibility.

    3. <u>Counsel's alterations to Murray's report</u>. In his deposition, Murray testified about alterations he made to his report at the suggestion of defense counsel. For example, Murray testified that he added the sentence "There were a number of national providers [of BPOs] in 2000 as there are today." *Motion* [#654], p. 8. Cartel argues that this and other alterations, made at the suggestion of defense counsel, render Murray's opinions unreliable because these alterations constitute the testimony of opposing counsel through the guise of an expert opinion. *Id*., p. 9. Murray has testified that his final report reflects his opinions and that no revisions were made to his report that do not reflect his opinions. *Response* [#704], p. 12. The alterations at issue are not so significant or substantial that they undermine the reliability of Murray's opinions. At most, these alterations go to the weight to be accorded to Murray's opinions.

    4. ***Daubert*** <u>requirements</u>. In ***Daubert***, the Court identified four non-exclusive and non-dispositive factors to be considered by a trial court when evaluating expert testimony. Those factors are (1) whether the theory at issue has been tested; (2) whether the theory has been subject to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards controlling the methodology's operation; and (4) whether the theory has been accepted in the relevant scientific community. ***Daubert***, 509 U.S. at 593 - 594; ***see also 103 Investors I, L.P. v.***

7

*Square D Co*., 470 F.3d 985, 990 (10th Cir. 2006); *Truck Insurance Exchange v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004). These factors are directly applicable to opinion testimony based on the scientific method. Their applicability to opinion testimony such as Murray's, which is not based closely on the scientific method, is more oblique. Notably,

> (t)he plaintiff need not prove that the expert is undisputably correct or that the expert's theory is "generally accepted" in the scientific community. Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements.

*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (citation omitted). "(A)ny step that renders the analysis unreliable ... renders the expert's testimony inadmissible." *Id.* at 782 (citing *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir.1994)).

Here, Murray's knowledge of the population of real estate brokers and agents who were willing to provide BPOs in 2000, his knowledge of the sources of information via which a person might find those brokers and agents, and his knowledge of the training and experience generally needed to provide BPOs is not disputed. In his report, Murray expresses adequately the facts, knowledge, and analysis on which he relied to reach his four expressed opinions. The factual and analytical bases for Murray's opinions are reasonably reliable. Any weakness in Murray's expertise, facts, or rationale go to the weight to be accorded to his opinion.

    5. <u>Conclusion</u>. The opinions expressed by Murray in his report are ostensibly admissible under Fed. R. Evid. 702. Thus, Cartel's motion to exclude Murray's opinions is denied.

**B.**

***Daubert* Motion To Exclude "Expert Testimony" of Robert A. Bardwell** [#655]

The defendants offer the opinion testimony of Dr. Robert A. Bardwell. Bardwell offers an opinion about the amount of time it would have taken Ocwen to identify and add 1,417 real estate professionals to Ocwen's database of BPO providers in the year 2000. This is an effort to determine how long it would have taken Ocwen to replicate the database of BPO providers that Ocwen acquired improperly from Cartel. Bardwell's opinion is based, in large part, on a survey conducted in early 2010. The survey targeted a representative sample of real estate brokers and agents to determine if they were qualified to provide BPOs and were willing to provide BPO's. *Motion* [#655], Exhibit A (Bardwell Report), pp. 6 - 10. Brokers who were contacted during the survey who were licensed in 2000 were asked to provide information relevant to their abilities and qualifications in 2000. *Id.*, p. 9. Bardwell opines that it would have taken 1,327.5 hours to build the database in question. *Id.*, p. 11. Cartel challenges the admissibility of this opinion, arguing that the survey on which Bardwell's opinion is based is not reliable because the survey used resources not available in 2000, the survey otherwise did not account for facts relevant to Ocwen's ability to construct such a database, and Bardwell's opinions generally do not satisfy the requirements of ***Daubert***.

1. <u>Survey's failure to account for certain facts</u>. Cartel argues that the survey on which Bardwell's opinion is based is fatally flawed because the survey does not account for certain key facts. First, Cartel argues that the survey used resources that were not available in 2000 to find real estate brokers and agents to contact. Eighty-nine percent of the broker contacts were found using only the 2000 Employment Relocation Council Directory, a resource available in 2000. To the extent the survey used other resources

9

that may not have been available in 2000 to find a small portion of its contacts, that potential flaw in the survey does not render the survey so unreliable that it is inadmissible under Rule 702.

Second, Cartel argues that the survey asked whether each participating realtor had access to the internet in 2000, but did not ask if each realtor knew how to use the internet in 2000. Use of the internet by BPO providers is relevant because Ocwen was developing a system that required BPO providers to provide information via the internet. The fact that the survey did not address this point does not make Bardwell's opinion so unreliable that it is inadmissible. This potential flaw in the survey goes only to the weight to be accorded to Bardwell's opinion.

Third, Cartel argues that the survey ignored whether or not the brokers contacted were willing to produce BPOs in 2000 for the price that Ocwen was willing to pay in 2000. The survey asked its subjects to specify how much they charge for a BPO, presumably in 2010. *Id.*, p. 9. Based on responses to this question, Bardwell concluded that the prices charged for BPOs have not changed significantly since 2000. *Id.*, pp. 12 - 13. Notably, the prices reflected in the survey generally are within the range of BPO prices used by Cartel and Ocwen during the time period at issue in this case. In this context, to the extent that the survey can be said to be flawed because it did not determine if each respondent would have provided BPOs in 2000 at the price offered by Ocwen, that flaw goes only to the weight to be accorded to Bardwell's opinion and not to its admissibility.

Fourth, Cartel argues that the survey does not address the question of whether or not Ocwen was willing in 2000 to devote the resources necessary to develop its own database of BPO providers. The survey's failure to address this fact does not

10

undermine the reliability of the survey. Rather, the survey reasonably can be based on the assumption that Ocwen was willing to devote such resources. This is particularly true in view of Cartel's pursuit of a head start theory of damages at the first trial. If Cartel can demonstrate that assumption to be unfounded, then Cartel may be able to demonstrate that the survey's conclusion does not fit the facts of this case. However, on the current record, it is not safe or fair to assume that Ocwen was unwilling to devote resources to the development of a database of BPO providers.

Fifth, Cartel argues that the survey does not account for the differences in the prevailing real estate market in 2010, as contrasted to 2000, and how those differences might affect a real estate broker or agent's motivation to provide BPOs. If the survey failed to account for this difference, that failure goes only to the weight to be accorded to the survey and Bardwell's opinion, and not to the admissibility of Bardwell's opinion.

2. ***Daubert* requirements**. As noted previously, in ***Daubert***, the Court identified four non-exclusive and non-dispositive factors to be considered by a trial court when evaluating expert testimony. Those factors are (1) whether the theory at issue has been tested; (2) whether the theory has been subject to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards controlling the methodology's operation; and (4) whether the theory has been accepted in the relevant scientific community. ***Daubert***, 509 U.S. at 593 - 594. Having reviewed the Bardwell's report, including his detailed description of the survey, I conclude that Bardwell relied on a reasonably reliable set of relevant facts and applied a reasonably reliable process of reasoning to those facts. Bardwell makes both the facts on which he relies and his reasoning transparent. In these circumstances, to the extent there are any flaws in the facts on which Bardwell relies or the reasoning he used, any such flaws

go only to the weight to be accorded to his opinion.

    3. <u>Conclusion</u>. The opinion expressed by Bardwell in his report is ostensibly admissible under Fed. R. Evid. 702. Thus, Cartel's motion to exclude Bardwell's opinion is denied.

## C.

### *Daubert* Motion To Exclude "Expert Testimony" of Roy Weinstein [#657]

    The defendants offer the opinion testimony of Roy Weinstein. Weinstein opines about the amount of unjust enrichment accruing to Ocwen from its misappropriation of Cartel's list of BPO providers. Weinstein opines that the amount of this unjust enrichment is "quantifiable by determining the economic benefit that Ocwen obtained from its use of the Cartel List, separate of other factors." *Motion* [#657], Exhibit A (Weinstein Report), p. 5. Weinstein concludes that Ocwen's unjust enrichment is equal to the sum of Ocwen's cost savings associated with developing a list of BPO providers plus the incremental profits that Ocwen derived from its access to the Cartel list during the period of time Ocwen would have required to develop such a list. Weinstein relied on Bardwell's report to determine the period of time needed to develop such a list. Cartel argues that Weinstein's opinions are not admissible under Fed. R. Evid. 702 because they constitute a legal conclusion, Weinstein's calculations are contrary to settled law, his opinion does not include consideration of certain relevant facts, and Weinstein's opinions generally do not satisfy the requirements of ***Daubert***.

    1. <u>Legal opinion</u>. Cartel argues that Weinstein's opinion amounts to a legal conclusion because Weinstein "pushes" the legal conclusion that unjust enrichment damages are limited to the out of pocket expenses Ocwen would have incurred to develop a list of BPO providers and the incremental profits Ocwen generated from

12

Cartel's BPO provider list. Weinstein does not opine that unjust enrichment damages are limited to these two factors as a matter of law. Rather, he opines that, under the circumstances of this case, any enrichment Ocwen derived from the Cartel list can be calculated in this fashion. His opinion is consistent with the head start theory that Cartel has advanced previously in this litigation. Weinstein's opinion offers a method of calculating unjust enrichment damages, but does not preclude necessarily consideration of other factors that may be permissible under applicable law or other methods of calculating unjust enrichment. To the extent Weinstein failed to consider or account for any such other factors, that failure goes to the weight to be accorded to his opinion and not to its admissibility.

     2. <u>Opinion contrary to settled law</u>. Cartel argues that, under Colorado law, a plaintiff in a theft of trade secrets case who establishes the defendant's liability is entitled to recover all of the unjust enrichment garnered by the defendant from the theft. Cartel argues that Weinstein's opinion is contrary to this law because he limits his calculation of unjust enrichment, as described above. I conclude that Weinstein's opinion is not inherently contrary to Colorado law. Rather, Weinstein proposes a method of calculating the unjust enrichment garnered by Ocwen that is consistent with Colorado law. To the extent Weinstein failed to consider or account for other factors that may be considered under applicable law, that failure goes to the weight to be accorded to his opinion and not to its admissibility.

     3. <u>Failure to consider relevant facts</u>. Cartel argues that Weinstein's opinion is unreliable because he did not consider three relevant facts when developing his opinion. First, Cartel notes that Weinstein did not calculate or consider the market value of Cartel's BPO provider list, in terms of the potential sale or lease of the list. Second,

Cartel notes that Weinstein did not determine whether Ocwen was willing to devote resources to build its own BPO list in 200.  Third, Cartel notes that Weinstein did not determine the costs or revenue associated with BPO providers that may have been referred to Ocwen by brokers on the Cartel BPO list.  Weinstein's failure to consider these facts, Cartel argues, renders his opinion "manifestly incomplete and unreliable." *Motion* [#657], p. 11.

I conclude that Weinstein's failure to consider these facts does not *ipso facto* render his opinion unreliable.  The potential market value of the list might be another way to measure unjust enrichment.  Even if that is true, that does not preclude Weinstein from opining about a different way to measure unjust enrichment.  Weinstein's failure to determine whether Ocwen was willing to devote resources to develop a BPO provider list also does not undermine the reliability of his opinion.  Rather, his opinion reasonably can be based on the assumption that Ocwen was willing to devote such resources.  This is particularly true in view of Cartel's pursuit of a head start theory of damages at the first trial.  If Cartel can demonstrate that assumption to be unfounded, then Cartel may be able to demonstrate that the survey's conclusion does not fit the facts of this case.  However, on the current record, it is not safe or fair to assume that Ocwen was unwilling to devote resources to the development of a database of BPO providers.  Weinstein's failure to account for costs or revenue associated with BPO providers that may have been referred to Ocwen by brokers on the Cartel BPO list also does not render his opinion unreliable.  Cartel cites nothing in the record to support the contention that Ocwen dealt with such BPO providers.  Absent some indication, as opposed to an assumption, that Ocwen's costs and revenue were affected significantly by the use of such BPO providers, there is no basis to conclude

14

that Weinstein's failure to account for such providers undermines the reliability of his opinion. At most, Weinstein's failure to consider these facts goes to the weight to be accorded to his opinion and not to its admissibility.

    4. *Daubert* requirements.

Cartel contends that Weinstein's opinion does not satisfy the four non-exclusive and non-dispositive factors stated in *Daubert*: (1) whether the theory at issue has been tested; (2) whether the theory has been subject to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards controlling the methodology's operation; and (4) whether the theory has been accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593 - 594. Having reviewed the Weinstein's report, I conclude that Weinstein relied on a reasonably reliable set of relevant facts and applied a reasonably reliable process of reasoning to those facts. Weinstein makes both the facts on which he relies and his process of reasoning transparent. In these circumstances, to the extent there are any flaws in the facts or rationale on which Weinstein relies, any such flaws go only to the weight to be accorded to his opinion.

    5. Conclusion. The opinion expressed by Weinstein in his report is ostensiblyadmissible under Fed. R. Evid. 702. Thus, Cartel's motion to exclude Weinstein's opinion is denied.

### IV. ORDERS

**THEREFORE, IT IS ORDERED** as follows:

    1. That the plaintiff's *Daubert* **Motion To Exclude "Expert Testimony" of Stephen H. Murray** [#654] filed August 5, 2010, is **DENIED**;

    2. That the plaintiff's the plaintiff's *Daubert* **Motion To Exclude "Expert**

**Testimony" of Robert A. Bardwell** [#655] filed August 6, 2010, is **DENIED**; and

    3. That the plaintiff's *Daubert* **Motion To Exclude "Expert Testimony" of Roy Weinstein** [#657] filed August 6, 2010, is **DENIED**.

Dated September 1, 2010, at Denver, Colorado.

                                        **BY THE COURT:**

*/s/ Bob Blackburn*
Robert E. Blackburn
United States District Judge